## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

BOBBI JO GIVEN,

       Plaintiff,

   v.                              **Case No. 2:17-cv-925**

                                      **JUDGE GEORGE C. SMITH**

CENTRAL OHIO GAMING           **Magistrate Judge Jolson**
VENTURES, LLC,

       Defendant.

## OPINION AND ORDER

This matter is before the Court upon Defendant Central Ohio Gaming Ventures, LLC's ("Defendant" or "COGV") Motion for Summary Judgment (Doc. 20) (the "Motion").  Bobbi Jo Given ("Plaintiff" or "Given") filed a Response (Doc. 27) and COGV filed a Reply (Doc. 32).  The Motion is ripe for review.  For the following reasons, the Motion is **DENIED**.

## I.      BACKGROUND AND PROCEDURAL HISTORY

COGV owns and operates the Hollywood Casino in Columbus, Ohio.  (Doc. 1, Compl. at ¶ 5).  COGV has employed Given since June 25, 2013.  (Doc. 22, Given Dep. at PAGEDID #254).  Given's initial position was as a Table Games Supervisor.  (*Id*. at PAGEID #335).  After working as a Table Games Supervisor, she worked as a Table Games Trainer and then moved into her role as a Revenue Audit Supervisor in February of 2016.  (*Id*. at PAGEID #336–38).  In her role as a Revenue Audit Supervisor, Given earned $48,000 per year and COGV initially classified her as exempt from the minimum wage and overtime requirements that are found in the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq*.  (Doc. 20-2, Meeks Decl. at ¶ 4).  In her role

as Revenue Audit Supervisor, Given reported directly to Jennifer Rivera ("Rivera"), who is the Revenue Audit Manager at the Hollywood Casino. (Doc. 20-3, Rivera Decl. at ¶¶ 3–4).

As of November 28, 2016, COGV reclassified several of its employees' positions from exempt status to non-exempt status. (*Id*. at ¶¶ 5–13). This change was driven by new regulations issued by the United States Department of Labor. (*Id*. at ¶ 7). These new regulations raised the minimum salary threshold to $913 per week to qualify for the executive exemption to the FLSA minimum wage and overtime requirements and were set to take effect December 1, 2016. (*Id*.).

In anticipation of these new regulations, COGV conducted an evaluation of its employees' positions to determine if they should be reclassified from exempt to non-exempt. (*Id*. at ¶ 8). During these evaluations, COGV conducted interviews with employees and asked them seven questions pertaining to their job responsibilities. (*Id*. at ¶ 9). The employees' responses were recorded on a Confidential Fair Labor Standards Act Audit Questionnaire (hereinafter, "FLSA Questionnaire"). (*Id*. at ¶¶ 10–11).

COGV interviewed Given and recorded her answers on a FLSA Questionnaire. (*Id*. at ¶ 11). As a result of this interview, Given's position was reclassified from exempt status to non-exempt. (*Id*. at ¶ 12). Although a federal court has enjoined the new FLSA regulations and they have yet to take effect, COGV has maintained their new classifications of employees, including Given. (*Id*. at ¶ 18). Thus, as of November 28, 2016, Given has been entitled to overtime pay for hours worked over 40 hours per week. (*Id*. at ¶ 15).

On October 23, 2017, Given brought the present action against COGV alleging that COGV violated the FLSA, the Ohio Minimum Fair Wage Standards Act, Ohio Revised Code Chapter 4111, *et seq.* ("OMWA"), and the Ohio Prompt Pay Act, Ohio Revised Code Section 4113.15 "OPPA"). The crux of Given's complaint is that she is owed overtime pay for the time period she

worked as a Revenue Audit Supervisor but was classified as an exempt employee (February 6, 2016–November 28, 2016).

## II.        STANDARD OF REVIEW

Defendant moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 716–17 (6th Cir. 2012).  The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment.  *Id.* at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the Court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party

and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). But self-serving affidavits alone are not enough to create an issue of fact sufficient to survive summary judgment. *Johnson v. Washington Cty. Career Ctr.*, 982 F. Supp. 2d 779, 788 (S.D. Ohio 2013) (Marbley, J.). "The mere existence of a scintilla of evidence to support [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson,* 477 U.S. at 251.

## III.    DISCUSSION

As stated above, Plaintiff's claims all stem from COGV's alleged misclassification of Plaintiff as exempt from the protections afforded under the FLSA while she worked as a Revenue Audit Supervisor from February 6, 2016 through November 28, 2016. COGV advances three main arguments in defense of Plaintiff's claims. First, it argues that Given has forfeited her right to oppose the Motion because she filed her Response late. (Doc. 32, Reply at 2–3). Second, COGV argues that Given was properly classified as exempt, and thus her FLSA claims fail. (Doc. 20, Motion at 14). Third, it argues that Given's state law claims are subject to the same set of operative facts and law as her FLSA claims, and because her FLSA claim fails, her Ohio claims must fail as well. (*Id*. at 23). This Court turns to those arguments now.

### A.    Plaintiff's Late Response

COGV argues that Given was tardy in filing her Response to the Motion, and thus this Court should disregard Given's opposition to the Motion. (Doc. 32, Reply at 2–3). Given filed her Response to the Motion on May 16, 2019 at 12:03 AM. (*See* Doc. 27, Response). Her Response to the Motion was due at 11:59 PM on May 15, 2019. (*See* Doc. 26, Order Granting Extension of Time to File Response).

Magistrate Judge Jolson has already addressed this issue. (*See* Doc. 38, Jolson Order). Given filed a motion to retroactively deem her May 16, 2019 Response as timely filed, and Magistrate Judge Jolson granted that motion. (*Id*.). She ordered that the May 16, 2019 filing be "deemed as having been filed by the May 15, 2019 deadline." (*Id*. at 2). Therefore, COGV's argument is moot and lacks merit.

**B.**     **There is a Genuine Dispute of Material Fact Regarding Whether Given Falls Under the Executive Exemption to the FLSA**

Under the FLSA, an employee who works more than 40 hours a week is entitled to overtime pay unless they meet one of the statutory exemptions. *See* 29 U.S.C. § 207(a)(1). If the employee is a "bona fide executive" as defined in the regulations, then they are exempt from overtime pay. *Mosquera v. MTI Retreading Co.*, 745 F. App'x 568, 570 (6th Cir. 2018) (citing 29 U.S.C. § 213(a)(1)). The executive exemption covers those employees

> (1) who are compensated on a salary basis of not less than $455 per week, and (2) whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) who customarily and regularly directs the work of two or more other employees; and (4) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

*Ganci v. MBF Inspection Servs., Inc.*, 323 F.R.D. 249, 257 (S.D. Ohio 2017) (Smith, J.) (citing 29 C.F.R. § 541.100(a)).

It should also be noted that claiming an exemption under the FLSA is an affirmative defense for which the COGV carries the burden of proof. *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007) ("FLSA overtime exemptions are 'affirmative defense[s] on which the employer has the burden of proof. . . [t]he defendant must establish through 'clear and affirmative' evidence that the employee meets every requirement of an exemption."). Thus, COGV must prove the affirmative defense by a preponderance of the evidence. *Id*. at 502.

This Court will now examine whether COGV properly classified Given as an executive by looking at those four requirements.

### 1.      Given was Paid More than $455 Per Week

The parties do not dispute that COGV paid Given a salary of $48,000 per year ($923 per week) in her role as a Revenue Audit Supervisor.  (*See* Meeks Decl. at ¶ 4).  Therefore, the requirement that Given make more than $455 per week is satisfied.

### 2.      Given's Primary Duty was Management

This requirement of the FLSA is composed of two items: first, the duties performed by the plaintiff must be of a managerial nature, and second, those duties must be the plaintiff's "primary" duty.   The regulations define "management" duties at the following, non-exhaustive, duties:

- interviewing, selecting, and training of employees;
- setting and adjusting their rates of pay and hours of work;
- directing the work of employees;
- maintaining production or sales records for use in supervision or control;
- appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status;
- handling employee complaints and grievances;
- disciplining employees;
- planning the work;
- determining the techniques to be used;
- apportioning the work among the employees;
- determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold;
- controlling the flow and distribution of materials or merchandise and supplies;
- providing for the safety and security of the employees or the property;
- planning and controlling the budget; and
- monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.  This is not an exhaustive list of management duties, nor does an employee need to perform all these duties to be classified as exempt.  Rather, it is simply a list of factors that courts can consider when determining whether an employee's duties were management duties.

The regulations also define what "primary duty" means. The regulations state that an employee's "primary duty" is "the principal, main, major or most important duty that the employee performs" and must be based upon "all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). The regulations further provide that when determining what an employee' primary duty is, courts should consider "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id*. Further, when courts examine an employee's role, they are to look to the actual activities performed by the employee rather than the employee's job description. *Ale v. Tenn. Valley Auth.*, 269 F.3d 680, 788–89 (6th Cir. 2001). The reality of these types of cases are that the "inquiry into whether the [p]laintiffs have a 'primary duty of management' is a fact intensive one." *Haas v. Behr Dayton Thermal Products, LLC*, No. 3:07cv139, 2008 WL 11351383, at *7 (S.D. Ohio Dec. 22, 2008).

### a. Given Performed Some Management Duties

It is clear to this Court that in her role as Revenue Audit Supervisor, Given at least occasionally performed duties that fit the "managerial" description. For example:

- Given participated in the interview and hiring process. During her time working as the Audit Supervisor Given participated in interviews and suggested candidates who may be a good fit within the Audit Department. (Doc. 20-3, Rivera Decl. at ¶¶ 14–15; 22). Rivera occasionally brought in candidates based on Given's recommendation. (*Id*. at ¶ 17). Additionally, one at least one instance, Given performed the entire interview and hiring process on her own without any oversight from Rivera. (*Id*. at ¶ 21).[1]

---

[1] It should be noted that while Given did conduct a hire entirely by herself, that was during a time period when Rivera was out on medical leave. Thus, this indicates that it may not have been within the scope of her normal job to complete the hiring process on her own. The fact that she did complete the process by herself with no oversight at least once, is however, probative of the level of trust that COGV placed in her during the interview and hiring process.

- Given played some role in the training of the auditors and the audit procedures. While the parties dispute the significance of the role that Given played, it is clear to this Court that Given was at least, by job description, responsible for developing a training program for the auditors. (*Id*. at ¶ 13). Additionally, Given worked with Rivera closely to develop the Standard Operating Procedures for the Chip Inventory Process. (*Id*. at ¶ 12). Again, the parties dispute Given's role in developing these procedures and that is analyzed below. For now, it is sufficient to say that Given played some role in the training of the auditors and the audit procedures.

- Given directed the work of the auditors. Given referred to her own work with the auditors as supervisory. In her annual self-evaluation, she stated: "I have supervised our team during change and conflict, and work with a very diverse team" and "I feel that I do a very good job of providing direction to our team through communication, accountability and integrity." (*Id*. at ¶ 5, Ex. C-1 (Appraisal Report) at PAGEID # 192–93). Further, Given held weekly one-on-ones with the auditors to "discuss audit performance or any other issues that need to be addressed." (*Id*. at ¶ 31). Given also would decide which auditor completed each audit and would assign work to auditors as the work arose. (*Id*. at ¶ 26; Doc. 20-2, Meeks Decl. at ¶ 20, Ex. B-4 (October Letter) at PAGEID #179). This information is sufficient to show that Given played some role in directing the work of the auditors.

- On at least some level, Given participated in evaluating the work of the auditors. She, on her own initiative, crated a "coach and catch" log where Given and Rivera recorded performance issues with each auditor. (Doc. 20-3, Rivera Decl. at ¶ 34). For example, one such comment that Given left in the "coach and catch" log stated: "Justin consistently wastes time on the clock. He does not come in well rested, and because of that, he is unfocused and cannot stay on task unless his supervisor is standing over his shoulder. This disregard for his work tasks is creating unnecessary overtime for the whole team." (*Id*., Ex. C-10 (Work History/Coaching Log) at PAGEID #221). On at least one occasion Given recommended an auditor for an award based on her belief that the auditor deserve recognition for his/her good work. (*Id*. at ¶ 36, Ex. C-11 (Given Email)). Given counters by pointing out that she was not involved in any of the formal performance evaluations, and that is further addressed below. But for now, it is sufficient to note that Given did play some role in noting the performance of the auditors, and thus, it is clear to this Court that some of her duties involved evaluating auditors' performance.

- Given was involved with auditor complaints and grievances. Auditors sometimes came to Given with their workplace related complaints or disputes. (Doc. 22, Given Dep. at PAGEID #444). Given handled issues relating to auditors yelling at each other, an argument over performing an audit, and one issue relating to an employee's use of perfume in the workplace. (Doc. 20-3, Rivera Decl. at ¶ 40, Ex. C-15 (Given Email); *Id*. at Ex. C-16 (Given Email); Doc. 20-2, Meeks Decl. at ¶ 20, Ex. B-4 (October Letter) at PAGEID #179). Once again, it is clear based on these facts that Given played at least some role in handling workplace disputes that arose during working hours.

- Given was involved with discipline of the auditors. On at least one occasion Given completed a disciplinary form for an auditor. (Doc. 22, Given Dep. at PAGEID #309).

While she was told that it was not her role to discipline the auditors, the auditor whom she completed the disciplinary form received a verbal warning from management. (*Id.*; Doc. 20-2, Meeks Decl., Ex. B-3 (Verbal Warning Summary)). Further, Given typed up another written warning for an auditor and indicated her preference to sit down and talk with Rivera before "anything else happens." (Doc. 20-3, Rivera Decl., Ex. C-18 (Given Email) at PAGEID #242). Regardless of whether this written warning was issued, the fact that Given wanted to discuss the incident with Rivera indicates that Given sometimes played a role in the disciplinary process.

- Given had input on the auditors' schedule and hours worked. While Rivera completed the initial weekly auditor schedules, Given offered her thoughts on the schedules and would alter the schedules as needed. (Doc. 20-3, Rivera Decl. at ¶ 9; Doc. 20-2, Meeks Decl. at ¶ 20, Ex. B-4 at PAGEID #180). Further, auditors would occasionally discuss their schedule with Given. (Doc. 20-3, Rivera Decl. at ¶ 11, Ex. C-2 (Phoeng Email)). Given also handled paid-time-off requests and made the decision on whether the time off was approved or denied. (Doc. 20-3, Rivera Decl. at ¶¶ 23, 25, Ex. C-6 (Paid Time Off Request Forms)). While the auditors had the option of submitting their requests for paid-time-off to either Rivera or Given, Rivera and Given would consult with each other regardless of who the requests were submitted to. (Doc. 20-3, Rivera Decl. at ¶ 24). There is enough evidence here to conclude that Given played at least a minor role in the schedule and hours that the auditors worked.

Comparing the evidence with the list of non-exhaustive management duties in the regulations, it is clear that at least some of Given's job duties were managerial in nature. The Court now turns to whether management duties were Given's "primary duty" in her role as Revenue Audit Supervisor.

> **b.** **There is a Genuine Dispute of Material Fact as to whether Management was Given's "Primary Duty"**

Given argues, in summary, that she had a supervisor who ran the audit department and Given was simply the intermediary for the auditors and Rivera. She further argues that Rivera handled most of the traditional management tasks, and thus, Rivera was the manager of the Audit Department, not Given. COGV argues that Given downplays her management role and that, despite the fact that Rivera oversaw the entire audit department, Given was still a manager within the department. Because of the conflicting evidence presented to this Court, there is a genuine dispute of material fact as to whether Given's primary duties were managerial.

Given focuses many of her arguments on the fact that she reported to Rivera and that Rivera, not Given, had decision-making authority and was ultimately responsible for the operation of the Audit Department. To be clear, while we find that a genuine issue of material fact exists regarding Given's primary duties, Rivera's role as Given's supervisor is not, by itself, enough to create the genuine issue of material fact. *Calvins v. Dolgencorp, Inc.*, No. 1:10-cv-261, 2011 WL 6848385, at *10 (S.D. Ohio Dec. 29, 2011) (Smith, J.) (citing *Speedway*, 506 F.3d at 507). Given's status as a manager and an employee who is managed are not mutually exclusive. Given can have a supervisor that she must report to while simultaneously be a supervisor herself. *Calvins*, 2011 WL 6848385 at *10 ("a local store manager's job is not any less managerial for FLSA purposes simply because she has an active district manager."). However, the extent to which Given was supervised does impact the analysis of her managerial role. If the supervision of Given was constant, overbearing, and resulted in Given lacking decision-making authority, then it is more likely that Given was not a manager. *See Speedway*, 506 F.3d at 506–07 (examining the impact of "the frequency with which the employee exercises discretionary powers" and an employee's "relative freedom from supervision."). If the supervision of Given was infrequent, lenient, and deferential, then it is more likely that Given herself exercised managerial duties frequently. *See Speedway*, 506 F.3d at 507 (comparing cases where the amount of time a managing supervisor spent on location overseeing an employee differed). Essentially what *Speedway* establishes is that the degree of autonomy an employee possesses affects whether they themselves are a manager.

Given had a daily checklist of her daily duties. (Doc. 28-12, Rivera Dep., Ex. 11 (Checklist)).[2] Given's role of daily tasks contained 38 line items, only 3 of which (roughly 8%)

---

[2] COGV argues that this checklist was not provided by COGV, but rather, a prior Revenue Audit Supervisor created the checklist to guide that employee's duties. (Doc. 32, Reply at 8). While this is true, Rivera provided this checklist to Given when Given began her employment because "it was a very good guideline." (Doc 28-1, Rivera Dep. at 150).

fell under a "supervisory duties" heading. (*Id.*). Of the non-supervisory duties, Given was responsible for completing the "flash report"[3] and daily taxes, running audit reports, gathering supplies and paperwork for the auditors, and customer service related issues. Even tasks that did fall under the "supervisory duties" sections were not necessarily managerial in nature. For example, tasks that fell under this section included handling Ohio Casino Control Commission requests, handling internal audit requests, issuing win/loss statements, and handling W-2G requests for individuals who required them. (Doc. 28-12, Rivera Dep., Ex. 11 (Checklist)). These responsibilities are arguably customer service, not managerial, related.

Given argues that, even assuming all the tasks under "supervisory duties" were managerial tasks, those duties only comprised 8% of Given's daily duties.[4] (Doc. 27, Response at 23). While it is true that about 8% of the daily checklist items fell under the "supervisory duties" heading, this is not dispositive when determining what an employee's "primary" duty is. This is true for two reasons. First, the number of tasks an employee must perform does not always equate to the time it takes to complete those tasks. For example, an employee can be tasked with 8% of her to-do items being managerial, but that 8% can take up 50% of the employee's time. Secondly, the amount of time an employee spends supervising is not dispositive when analyzing what an employee's "primary duty" is. *Calvins*, 2011 WL 6848385 at *8 ("the importance of Plaintiff's management responsibility exceeds that of her more time-consuming non-management activities."). Rather, "primary duty" depends on what is the *most important* tasks an employee performs. 29 C.F.R. § 541.700(a) (emphasis added). Thus, supervisory duties may have only comprised 8% of Given's tasks, but that 8% may have been Given's most important tasks. For

---

[3] The "flash report" was a daily report of casino revenue activities.
[4] Given argues that the "supervisory duties" comprises roughly 7% of her daily checklist of duties. However, by this Court's math, three divided by thirty-eight equals 7.89%. Therefore, this Court rounds up to 8% for the purposes of this Order.

those reasons, the checklist, while informative to Given's daily duties, is not dispositive of whether her "primary duties" were managerial.

Given next argues that the pay discrepancy between herself and Rivera shows Given was not paid like a manager would be paid. (Doc. 27, Response at 35). Given was paid $22,000 per year less than Rivera. (Doc. 28-1, Rivera Dep. at 44) (stating that Rivera's starting salary was $70,000). Further, although Rivera and Given had essentially the same job description, it is the actual job duties performed, not the job description, that is the thrust of the FLSA analysis. (*See* Doc. 20-1, Ex. A-3 (Revenue Audit Supervisor Job Description); Doc. 27-1, Ex. 1-A (Revenue Audit Manager Job Description)).

It is true that when analyzing an employee's "primary duties" the Court should look at the duties that an employee actually performs rather than the duties that are contained in the employee's job description. *Speedway*, 506 F.3d at 503 ("courts cannot rely upon the plaintiff's or the employer's description of the plaintiff's position or authority; instead we must 'look at the plaintiff's actual duties' to determine whether she qualifies for the executive exemption.") (quoting *Ale v. Tennessee Valley Authority*, 269 F.3d 680, 692 (6th Cir. 2001)). Further, it is also true that courts should take into consideration the pay discrepancy between an employee who is claiming a violation of the FLSA and other employees' pay. *Speedway*, 506 F.3d at 508 (contemplating the relationship between the plaintiff employee's salary and the wages that were paid to employees who performed similar non-exempt work). Thus, here, we must consider the actual duties that Given performed. Further, the fact that Given's and Rivera's job descriptions were similar carries little weight in establishing what Given's primary duties were.

The parties have not briefed the pay discrepancy between Given and the subordinate auditors, which is the relationship that the Sixth Circuit evaluated in *Speedway*. *See Speedway*,

506 F.3d at 508. Given, instead of focusing on the relationship between her pay and the non-exempt auditors, focuses on the discrepancy between her pay and Rivera's pay. Rivera made $22,000 more per year than Given. This pay discrepancy, while less helpful than comparing Given's pay to non-exempt employee's pay, does show that Given made substantially less than an undisputed manager employed by COGV. Therefore, the pay discrepancy does cast some doubt that COGV paid Given like other managers.

Given next argues that Rivera was responsible for managing the audit department, not Rivera. (Doc. 27, Response at 31). Given argues that this is evident because Rivera was the highest paid employee within the department, only Rivera attended COGV manager meetings, and Given reported directly to Rivera on a day-to-day basis.[5]

COGV held monthly manager meetings where the managers from various departments attended. (Doc. 28-1, Rivera Dep. at 82). Rivera attended these monthly meetings and Given did not. (*Id*.). Again, this is not dispositive of whether Given was a manger. However, it does speak to the fact that COGV apparently did not see it as essential for someone in Given's position to attend its monthly managers meeting.

The evidence also shows that Rivera and Given were in almost constant communication throughout the workday. Each morning they held a daily morning meeting to discuss the upcoming challenges of the day. (*Id*. at 50). When problems arose during the day, Given would contact Rivera to help resolve them. (*Id*. at 133). Even during Rivera's days off, Given would contact Rivera to discuss issues that arose. (*Id*.). For example, on one of Rivera's days off, an auditor was sleeping at lunch and Given texted Rivera asking her "what do you want me to do?" (*Id*. at 212). This evidence seems to show Given's lack of independent authority and responsibility to make

---

[5] This Court addressed the pay discrepancy arguments advanced by Given above and need not repeat that analysis here.

managerial decisions. It is well established that constant oversight by a supervisor decreases the managerial functions of an employee. *Speedway*, 506 F.3d at 507. Thus, the reality that Given met with Rivera everyday to discuss the upcoming day and that Given felt the need to constantly run issues by Rivera (even when Rivera wasn't in the office) could indicate that Given did not feel she possessed real managerial authority.

Further, statements from Rivera indicate that she was the one who managed the Audit Department. (*Id*. at 60; 235) (In response to a question asking if Rivera was the supervisor, Rivera responded "Yes, I was responsible for supervising, uh-huh." In response to a question about who was responsible for managing the staff Rivera responded "Yes, I was also responsible for managing the staff." Rivera testified that "I handled the team and she [Given] will handle the customer service calls"). When discussing the training of the auditors Rivera testified that an individual needs to "master" the audit process in order to supervise, and Given had not mastered the process. (*Id*. at 89). Thus, it appears Rivera implicitly admitted that Given could not have supervised the auditors because Given had not mastered the process. However, it is also possible that there was simply a learning curve that Given had to undergo and once she had mastered the audit process she then assumed a more managerial role. On balance, the evidence shows that Rivera was the undisputed head of the audit department, but this by itself is not enough to show that Given's primary role was not managerial.

Given next proposes that Rivera was the one who actually handled employees' grievances and complaints, not Given. (Doc. 27, Response at 48). Further, Given argues, Rivera was responsible for disciplining employees. (*Id*. at 50). Here, there is evidence showing that Rivera was the chief disciplinarian of the audit department. On at least one occasion Given attempted to discipline an auditor and Rivera told Given that "it is not [Given's] position to offer discipline to

the auditors." (Doc. 22, Given Dep. at PAGEID #309). Given further testified that this was "the one and only time I ever tried to discipline an auditor, because after that instance, it was made very clear to me that I had no such power." (*Id*.). After this incident it appears that Given routinely reached out to Rivera or the HR department for direction on disciplinary matters. (Doc. 28-1, Rivera Dep. at 138) ("If [Rivera] was off, yeah, she would go to [HR]"). Rivera testified that it was her belief Given had the "authority to issue" but that "I think [Given] understood that it was better off for her to just have a second opinion." (*Id*. at 218). Given's feelings on the matter illustrate her perceived lack of authority to discipline, she stated: "I have clearly shown that I am willing to discipline the auditors when it is required, but I cannot because my hands are tied by my managers." (Doc. 20-2, Meeks Decl., Ex. B-4 (Given Letter) at PAGEID #181).

COGV, however, contends that Rivera had a voice in the disciplinary process and points to instances where auditors approached Given with their grievances. (Doc. 22, Given Dep. at PAGEID #437; PAGEID #444). The record supports that while some auditors approached Given with complaints, there was at least one period where "[t]here was a lot of friction" and grievances did not need to be resolved by Given because "when [the auditors] have any specific problems, [Given] can either ignore them or not give them the answer, so they will come straight to [Rivera] or they will wait until [Rivera] came back from [Rivera's] days off to have those resolved." (Doc. 28-1, Rivera Dep. at 101–02). One at least on one occasion, Given's proposed method of resolving a dispute was not followed because it might have escalated the situation further. (*Id*. at 227). Thus, once again, it appears that there is a genuine dispute of material fact with regards to the scope of Given's role within the disciplinary process.

Given also disputes her role in the employee evaluation process because Rivera was the one who completed all formal evaluations for the employees in the Audit Department. (Doc. 27,

Response at 56).  While it is true that Given created the "coach and catch" log (discussed above), it is clear from the record that Given did not complete formal performance evaluations.  (Doc. 28-1, Rivera Dep. at 93).  While Given may have commented on auditor performance, Rivera completed each auditor's annual performance evaluation.  (*Id*. at 104–05).

Given next argues that Rivera was responsible for creating the schedule, not Given.  (Doc. 27, Response at 56).  The record contains evidence showing that Rivera always created the official auditor schedules.  (Doc. 20-3, Rivera Decl. at ¶ 9; Doc. 22, Given Dep. at PAGEID #304; PAGEID #321; PAGEID #440).  While Given may have provided her input on the schedules or sometimes made changes to the schedule as needed, Rivera was the one who was ultimately responsible for the schedules.  (Doc. 20-3, Rivera Decl. at ¶9–10).  There was at least one instance where Given tried to create a schedule for specific auditors to collect paperwork on a given day of the week and this was overruled.  (Doc. 28, Exs. 22 and 23 (Given Emails)).  Again, this is not dispositive of whether Given's primary duties were managerial.  But consistent with the common theme, it sheds some light on the parties' disagreement regarding how much decision-making authority Given held.

Given argues that Rivera determined the techniques and processes that would be used for completing audits.  (Doc. 27, Response at 60).  There is some evidence to support this argument— Given stated in an anonymous employee survey that her greatest frustration at work was "[w]hen I offer up a contribution to improve a process, and it is denied without explanation."  However, Rivera also testified that developing certain techniques and processes of the Audit Department was a joint task shared between Rivera and Given.  (Doc. 28-1, Rivera Dep. at 71) ("I will say I share this with [Given]" and "[t]he procedure, yes, we created that in collaboration with [Given]").

Given also asserts that she did not train the auditors. (Doc. 27, Response at 61). While it was part of Given's job description to develop a training program for the auditors in the department, Rivera testified that Given did not have enough mastery of the audit process to train auditors. (Doc. 28-1, Rivera Dep. at 88–90). Given's responsibility to create the training program never came to fruition. (*Id*. at 89–90) (Rivera stating that while it was Given's responsibility to have trainings, she faced "challenges" doing the training and thus other auditors did the actual training). Once again, the FLSA analysis is determined by an employee's actual role, not what their job description calls for. *Speedway*, 506 F.3d at 503. There is enough evidence here to create a genuine dispute of material fact as to whether Given actually trained the auditors.

Lastly, Given asserts that Rivera was involved in controlling the budget of the Audit Department and ensured that the Audit Department was in regulatory compliance. Rivera and the Finance Director were responsible for creating and setting the budget of the Audit Department. (Doc. 28-1, Rivera Dep. at 68–69). It appears that Given would chime in with her thoughts on budget issues the department was facing. (*Id*.). However, Given did not attend budget meetings nor have any budget decision-making authority. (*Id*.).

Additionally, there is evidence to suggest that Rivera was responsible for ensuring the audit department's regulatory compliance and any compliance issues that were brought to Given were immediately forwarded along to Rivera. (*Id*. at 86–87) ("[auditors] will go to [Given] first and she will escalate that to me"). Although, at a separate point, Rivera testified that both her and Given were responsible for compliance of revenue activities. (*Id*. at 69).

Consistent with the other elements of the FLSA analysis, it appears that Given may have had input on the budget and compliance matters, but non-managers can, and frequently do, offer their thoughts on issues that are facing the employees in a division. The simple fact that employees

offer their thoughts on issues does not necessarily elevate them to managerial status. Once again, it appears there is a genuine dispute of material fact over the importance of the role Given played into the budget and compliance process.

Given also points out that Rivera was on medical leave for six weeks during Given's employment. (Doc. 27, Response at 63). During this time period, it appears that Given performed more managerial functions than she otherwise would. For example, when Given hired an auditor on her own without Rivera, Rivera was on medical leave. (Doc. 28-1, Rivera Dep. at 95–96). Thus, COGV's evidence about Given's management responsibility during Rivera's medical leave is slightly skewed and not necessarily reflective of normal operations of the Audit Department.

Importantly, COGV's own conduct casts doubt on their whether the initial decision to classify Given as an exempt employee was correct. When the proposed FLSA regulations increased the salary threshold for the executive exemption, COGV performed an audit of all of its employees to determine if they need to be re-classified from exempt to non-exempt or vice versa. (Doc. 20-2, Meeks Decl. at ¶¶ 7–9). COGV paid Given $923 per week in her role as Revenue Audit Supervisor. (*Id*. at ¶ 4). The new regulations increased the salary threshold for the executive exemption from $455 per week to $913 per week. (*Id*. at ¶ 7). Thus, even after the proposed new regulations, Given's salary exceeded the FLSA executive exemption salary threshold. However, COGV decided to re-classify Given as a non-exempt employee anyways. (*Id*. at ¶ 12). Presumably, this change in classification occurred because COGV performed an audit of Given's position and decided that the position should be a non-exempt position, but the new salary threshold did not demand the change. While Given was re-classified from exempt to non-exempt, Rivera was not. As a result of COGV's re-classification of Given's employment status, a reasonable jury could interpret this to mean that COGV misclassified Given as an exempt

employee when she began her role as a Revenue Audit Supervisor. Thus, a genuine issue of material fact exists as to why COGV decided to classify Given as non-exempt after treating her as an exempt employee for the first 7–8 months of her employment.

Looking at the facts in a light most favorable to Given, because of the discrepancy in decision-making power, the types of tasks that Given performed on a day-to-day basis, Given's deference to Rivera on certain management issues, and the fact that COGV re-classified Given as a non-exempt employee, this Court finds that there are genuine disputes of material fact as to whether Given's "primary duties" were not managerial.

While it is not necessary to continue the executive exemption analysis because there is a genuine dispute of material fact as to whether Given's primary duty was management, this Court will quickly consider the remaining factors.

### 3.    Given Supervised Two or More Employees

The next requirement is that Given supervised two or more employees during her time working for COGV. This prong is easily established as a result of the FLSA questionnaire that Given completed. The questionnaire asked Given if she "supervise[d] at least two full-time Team Members **or** two FTEs?" (Doc. 20-2, Meeks Decl., Ex. B-2 (FLSA Questionnaire) at PAGEID #171) (emphasis in original). Given answered the question in the affirmative, indicating that she did supervise two or more individuals. (*Id.*).

The extent to which she supervised those employees is not at issue here. That is a question that this Court properly addressed in Section III.B.2.b *supra* when considering whether Given's primary duty was management. *See Speedway* at 502–03 (establishing that in a FLSA analysis the extent of any supervision is properly examined under the primary duty analysis); *Haas*, at *14 (finding that with regards to the supervision or two or more employees requirement "it is sufficient that each of the [p]laintiffs has testified that he is responsible for the general supervision of two or

more other employees.").  Therefore, the requirement that Given supervise two or more employees is satisfied.

### 4.    Given's Opinion on Hiring/Firing Carried Particular Weight

The last requirement that Given must satisfy to fall under the executive exemption is that she must have either 1) had authority to hire or fire individuals, or 2) her opinion with regards to hiring or firing carried particular weight.  *See* 29 C.F.R. § 541.100(a)(4).  "'[A]n employee's suggestions or recommendations may still be deemed to have 'particular weight' even if a higher-level manager's recommendation has more importance and even if the employee does not have the authority to make the ultimate decision as to the employee's change in status.'"  *Lindsey v. Tire Discounters, Inc.*, No. 2:15-CV-3065, 2017 WL 5972104, at *12 (S.D. Ohio Dec. 1, 2017) (Smith, J.) (quoting 29 C.F.R. § 541.105).

It is clear to this Court that Given played a significant role in the hiring process.  First, it appears from the record that Given herself hired at least one employee.[6]  Rivera stated that Given participated in the hiring process.  (Doc. 20-3, Rivera Decl. at ¶ 21) ("Ms. Given and myself were involved in the process of hiring new auditors for the team and would actively collaborate.  Ms. Given would either conduct the first interview or Ms. Given and I would conduct the interview together.").  Rivera also stated that "[i]n May 2016, Ms. Given hired Auditor Riky Phoeng.  I did not interview Mr. Phoeng.  The process was handled entirely by Ms. Given with the assistance of the Human Resources Department."  (*Id.* at ¶ 21).  This statement certainly seems to indicate that COGV provided Given with the ability to hire individuals.

Even if Given did not have the explicit authority to hire or fire individuals, she appears to have been very involved in the hiring process and her opinion seemed significant.  Rivera stated:

---

[6] However, as noted above, Given only hired an employee on her own when Rivera was out on medical leave.  Thus, while Rivera was present, she appears to have checked Given's hiring authority.

"[i]f I wished to hire an Auditor but Ms. Given did not, I could have done so. However, that never happened. I considered Ms. Given's input *very important* and took it *very seriously*." (*Id*. at ¶ 20) (emphasis added). Additionally, Given would "screen resumes and would often request that individuals be interviewed for the auditor position if she believed they would be a good fit." (*Id*. at ¶ 15). On at least one occasion a candidate was brought in for an interview based on Given's recommendation. (*Id*. at ¶ 17). Given even admits herself that she played a part in the hiring process. On her FLSA Questionnaire Given stated that she "[p]rovides recommendation and plays part of team collaboration process." (Doc. 20-2, Meeks Decl., Ex. B-2 (FLSA Questionnaire) at PAGEID #172).

Considering all these facts, there is ample evidence for this Court to conclude that Given possessed the authority to hire or fire employees. At the very least, the evidence shows that Given participated in the hiring process and that her supervisor gave her opinion significant weight. For these reasons, this Court finds that this prong of the FLSA analysis is satisfied.

To summarize the FLSA executive exemption analysis, Given met the salary threshold, she directed two or more employees, and she played a significant role in the hiring process. Further, Given did perform some management duties. There is, however, enough evidence to create a genuine dispute of material fact as to whether management was Given's "primary" duty. This casts into doubt whether COGV properly classified Given as an exempt employee. For that reason, the Motion is **DENIED**.

## C. Ohio Law Claims are Not Moot Given this Court's Decision on the FLSA Claims

COGV argues that this Court must dismiss Given's claims pursuant to the Ohio Prompt Payment Act and the Ohio Wage Act because they are subject to the same set of operative facts and law as her FLSA claims. COGV reasons that because Given's FLSA claims of unpaid overtime are meritless the claims pursuant to Ohio law must also fail. (Doc. 20, Motion at 23–24)

21

("because COGV is entitled to summary judgment on Given's underlying unpaid overtime claims under the FLSA and Ohio law, it follows that COGV is entitled to summary judgment on all remaining claims of Given.").

However, because this Court is allowing the FLSA claims to proceed, COGV's argument fails. *See Clark v. Shop34 Global, LLC*, 77 F. Supp. 3d 660, 688 (S.D. Ohio 2015) (finding that where a genuine dispute of material fact exists with regards to an employee's FLSA exempt status summary judgment cannot be granted on Ohio's wage and hour recordkeeping requirements); *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 384 n.1 (6th Cir. 2016) (noting that "[b]ecause the FLSA and the [Ohio Minimum Fair Wage Standards Act] have the same overtime requirements, the outcomes will be the same and the claims can be evaluated together."). Therefore, the Motion with regards to the Ohio law claims is **DENIED**.

## IV.     CONCLUSION

For the foregoing reasons the Motion is **DENIED**.

The Clerk shall remove Document 20 from the Court's pending motions list. The Clerk shall enter final judgment accordingly.

**IT IS SO ORDERED.**

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**